### LEIB v. ELECTRIC MERCHANDISE Co. et al.

*(Circuit Court, N. D. Illinois. January 4, 1892.)*

PATENTS FOR INVENTIONS—NOVELTY—ELECTRIC RAIL-CONNECTORS.
Letters patent No. 434,087, issued August 12, 1890, to Charles Leib for an electric rail-connector, consisting of a short metallic wire with each end passing through a bolt or rivet, which is firmly inserted into a hole drilled in the rail, are void for want of novelty over the Gassett & Fisher patent of May, 1880, in which the connecting wire is coiled round the heads of the rivets, instead of passing through them, as well as the Westinghouse patent of July 31, 1883, and the Winton patent of April 14, 1885, in which the ends of the wires are directly inserted in holes in the rails.

In Equity. Bill by Charles Leib against the Electric Merchandise Company and others for infringement of a patent. Bill dismissed.

*Phillips Abbott* and *W. E. Furness*, for complainant.

*F. W. Parker*, for defendants.

BLODGETT, J. This is a bill in equity for an injunction and accounting, by reason of the alleged infringement of patent No. 434,087, granted

August 12, 1890, to Charles Leib, for an "electric rail-connector." The purpose of the device is to secure a more continuous electrical connection between the rails of electric railroads, whereby a more perfect electric circuit is secured. Briefly described, the rail-connector in question consists of a short metallic wire, each end of which is passed through the head of a bolt or rivet, and these rivets firmly inserted in holes drilled into the rails to be connected. The claims of the patent are:

"(1) A rail-connector comprising a rod or wire having pins extending transversely across its ends, the rod passing through the pins, substantially as set forth. (2) A rail-connector comprising a rod or wire having tapering pins extending transversely across its ends, and projecting beyond the rod or wire at all sides thereof, substantially as set forth."

The patentee says in his specification:

"My invention * * * is designed to obviate defects in the methods and devices heretofore employed; and it consists in making terminals or pins which enter the rails integral, or practically so, with the connecting wire or bar which extends from one to the other."

The defenses insisted upon are: (1) Want of patentable novelty; (2) that defendants do not infringe.

The proof in the case seems to establish the proposition that these wire connections between rails of the track of an electric railway are not indispensable to the operation of an electric railway, but that better work by the motors is secured by a wire connection of the rails than by relying solely upon the connection of the rails by the fish-plates; the metallic contact of the fish-plates being liable to become impaired by rust or the loosening consequent upon the vibration or jar of the rails and plates from use.

Upon the question of novelty, the defendants have introduced several prior patents, showing the state of the art prior to the device covered by the patent in question; the proof showing that the complainant first conceived his device, now covered by his patent, in 1889. The earliest device cited by the defendants is what is called "the Bain jumper connection," used to connect telegraph wires as early as 1870, which shows an insulated wire cable passing through the heads of a stud, at each end, and with insulated handles, and these studs, being connected with the telegraph wires to be connected, allow an electric circuit through the wire cable.

The next device in order is the patent of May, 1880, to Gassett & Fisher, in which the inventors say:

"It has been found in practice that the usual chairs or fish-plates do not in dry weather afford sufficiently good metallic continuity to form a good conductor, chiefly on account of the oxidation of the surfaces. To obviate this, elastic contact-pieces have been used, intended to be caused to rub by the deflection of the rails, and thus always afford a contact surface of bright metal. It is known, however, that a conductor composed of many pieces in contact with one another, as a wire spliced, but not soldered at many points, offers more resistance than one of continuous metal similar in all other respects to the first. * * * Our invention consists in punching or drilling holes in the flanges

of adjacent rails at convenient points near, but so as not to interfere with, the rail-joint, and driving into these holes the ends of a wire-connector long enough to reach between them and span the rail-joint, the said connector being provided at its ends with driving-studs a trifle larger in diameter than the holes, and tapering, so that when they are forcibly driven into the holes in the rail they form a perfect and permanent contact therewith, and, on account of the taper, fit so tightly that they cannot be driven out or removed except by a special instrument for drawing them, thus removing from them any scale or loose or tarnished surface, and leaving the surface thereof bright where it comes in contact with the rail, such bright metallic surfaces, forced together, insuring a perfect electric connection. The ends of the wire-connector are coiled around the said driving-studs just under their heads, and the whole end then dipped in molten solder or other suitable metal."

Here we find a device which is, in principle of operation and mechanical construction, exactly like that described in the complainant's patent, except that the ends of the connecting wire are wound around the head of the stud or rivet which is inserted in the rail, instead of being inserted in the head of the rivet, as called for in complainant's patent. The difficulty to be overcome and the end to be attained by such a connection is clearly set forth in this old Gassett & Fisher patent, and the only difference is that, in the old device, the ends of the wire were closely wrapped or coiled around the head of the stud which was driven into the hole in the rail, and the stud and coil dipped in molten solder, so as to insure metallic contact and satisfactory conducting qualities.

The Westinghouse patent of July 31, 1883, shows a wire-connector, one end of which is inserted in each rail to be connected. The only essential difference of construction between this device and that covered by the complainant's and the Gassett & Fisher patent is that the ends of the wire are inserted directly in the rails to be connected, instead of inserting the ends of the wire in a hole in the stud, or coiling the wire tightly around the head of the stud, and driving the stud into the holes drilled in the rails. One of the forms of construction of the complainant's patent, as shown in Fig. 2 of his drawings attached to his patent, was to upset the end of the connecting wire, and swage it up, so as to form on it two pins adapted to be driven into holes in the rails, thereby dispensing with the studs or rivets, and making his connector from one piece of metal. In other words, the connector and the rivets or studs, which entered into the holes drilled in the rails, were integral. I cannot see, if this patentee could construct his device of a single piece of metal, one end driven into the hole in one rail and the other end driven into the hole in the other rail, how it is possible to distinguish the device, either as an invention or as a mechanical structure, from that covered by the Westinghouse patent. Westinghouse took a single wire, bent a short portion of each end at a right angle, and inserted this short right-angled piece in the holes drilled for that purpose in the rails. He does not provide for upsetting or swaging the ends of the wire, but that would be a mere mechanical operation, desirable or not, according to the size of the wire used, or the size of the holes drilled in the rails.

There could be no invention in the mere matter of swaging up or upsetting the ends of the wire in order to form a larger stud, or what takes the place of a stud at the ends of the wire. Then, there is the Winton patent of April 14, 1885, which shows a rail-connector consisting of a wire, the ends of which are firmly driven or pressed into holes drilled or punched in the flanges of the rails to be connected. As Leib does not direct as to what part of the rail the hole is to be drilled in for the purpose of the wire-connector, and leaves the location of the hole for the connector to the choice of the constructor or mechanic, I cannot see wherein this device differs in principle from that covered by the complainant's patent. And the same may be said of the Stitzel & Windel patent of June, 1888, where the device is substantially the same. The proof also shows that the complainant, as early as 1886, made and put in use a rail-connector, which consisted of a metallic wire, each end of which was inserted in a metallic block, and through this block was driven a stud or bolt, to be inserted in the holes in the rails. This metallic block, into which the ends of the wire were inserted, was but a continuation of the wire, and, while it may not have been as durable as that covered by the complainant's patent, it still, in all essential particulars, embodied the principle of the complainant's patent.

I think the proof shows that the complainant's form of construction for a rail-connector, when one is used, is more simple and less expensive than any of the previous forms shown, unless it be that shown by Westinghouse. But the changes which the complainant made are only mechanical changes, and do not introduce any new principle or mode of operation into his connector which was not known in the older art. After Gassett & Fisher had shown their device for making a connector from rail to rail by means of the wire wound round the head of the stud driven into holes drilled into the rail, they would have undoubtedly had the right, in practice, to have fastened their connecting wire to the stud, by inserting it into holes made in the head of the stud, as an equivalent for their coil, because the hole through the head of the stud was but another mode of fastening the wire and the stud in close metallic contact. And the coil which passed around the head of the stud was in all respects the same as the hole made in the head of the stud into which the coil was inserted, so far as the principle of operation was concerned. For these reasons I am forced to the conclusion that the device covered by this patent is not novel, and that this cause should be dismissed for want of novelty in the patent; and the bill will be dismissed for want of equity.